**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEY INVESTMENT GROUP LLC,<br><br>Movant,<br><br>v.<br><br>SENATOR BEN RAY LUJÁN and SENATOR MARSHA BLACKBURN<br><br>Respondents. | Misc. Case No. __________ |

**MEMORANDUM OF POINTS AND AUTHORITY**
**IN SUPPORT OF KEY INVESTMENT GROUP LLC'S**
**MOTION TO COMPEL COMPLIANCE WITH THIRD-PARTY SUBPOENAS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND ..... 2

A. The BOTS Act and the FTC's Prior Enforcement Under the Act. ..... 2

B. The Underlying Litigation and Related Ticketmaster Lawsuit. ..... 5

C. The Senators Publicly Criticize Ticketmaster. ..... 6

D. KIG and Ticketmaster Move to Dismiss and the Senators file *Amicus* Briefs in Support of the FTC ..... 7

E. The District Court Relied Upon Arguments Advanced by the Senators in Denying KIG's Motion to Dismiss in the Underlying Litigation. ..... 10

F. KIG's Efforts to Obtain the Requested Discovery from Senators Luján and Blackburn. . 11

LEGAL STANDARD ..... 13

ARGUMENT ..... 14

I. The Modified Requests Seek Information Highly Relevant to Claims and Defenses in the Underlying Litigation ..... 14

II. The Modified Requests Do Not Implicate Any Form of Privilege ..... 177

III. The Senators' Remaining Boilerplate Objections are Without Merit ..... 20

A. The Modified Requests Do Not Subject the Senators to Undue Burden ..... 20

B. The Documents Requested Do Not Implicate the Attorney-Client Privilege or Work-Product Doctrines ..... 22

CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alexander v. F.B.I.*,
186 F.R.D. 21 (D.D.C. 1998) .................... 14

*Athridge v. Aetna Cas. And Sur. Co.*,
184 F.R.D. 181 (D.D.C. 1998) .................... 21

*Blumenthal v. Drudge*,
186 F.R.D. 236 (D.D.C. 1999) .................... 23

**BuzzFeed, Inc. v. U.S. Dep't of Just.*,
318 F. Supp. 3d 347 (D.D.C. 2018) .................... 16, 21

*Educ. Fin. Council v. Oberg*,
2010 WL 3719921 (D.D.C. Mar. 8, 2010) .................... 16

*Federal Trade Commission v. Key Investment Group LLC, et al.*,
Case No. 1:25-cv-02716 .................... 1

*Flanagan v. Wyndham Int'l Inc.*,
231 F.R.D. 98 (D.D.C. 2005) .................... 17

*Franklin v. Mass.*,
505 U.S. 788 (1992) .................... 17

*Glassroth v. Moore*,
229 F. Supp. 2d 1290 (M.D. Ala. 2002), *aff'd*, 335 F.3d 1282 (11th Cir. 2003) .................... 19

**Gravel v. United States*,
408 U.S. 606 (1972) .................... 17, 18, 20

*Heat & Control, Inc. v. Hester Indus., Inc.*,
785 F.2d 1017 (Fed. Cir. 1986) .................... 22

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) .................... 19

*In re Denture Cream Prods. Liab. Litig.*,
292 F.R.D. 120 (D.D.C. 2013) .................... 14

*In re Micron Tech., Inc. v. Sec. Litig.*,
264 F.R.D. 7 (D.D.C. 2010) .................... 14

**Jewish War Veterans of the U.S. of Am., Inc. v. Gates*,
506 F. Supp. 2d 30 (D.D.C. 2007) .................... 17, 19

*McCarthy v. Pelosi*,
5 F.4th 34 (D.C. Cir. 2021) .................... 17, 18

*McSurely v. McClellan*,
553 F.2d 1277 (D.C. Cir. 1976) .................... 20

*N.Y. State Ass'n of Realtors, Inc. v. Shaffer*,
135 F.R.D. 78 (S.D.N.Y. 1991) .................... 19

*Northrop Corp. v. McDonnell Douglas Corp.*,
751 F.2d 395 (D.C. Cir. 1984)....................17

*Tequilla Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*,
242 F.R.D. 1 (D.D.C. 2007)....................21

*United States v. AT&T, Inc.*,
2011 WL 5347178 (D.D.C. Nov. 6, 2011)....................21, 22

*Watts v. S.E.C.*,
482 F.3d 501 (D.C. Cir. 2007).................... 13, 14, 20

**STATUTES**

*15 U.S.C. § 45c.................... passim

**OTHER AUTHORITIES**

2016, S. 3183 114th....................3

Pub. L. No. 114-274, 130 Stat. 1401 (2016)....................4

S. Rep. No. 114-391....................3

Senate Hearing on the BOTS Act in September 2016, Senator Moran....................3

U.S. Const. art. I, § 6, cl. 1....................17

**RULES**

Federal Rule of Civil Procedure 26....................1, 14

Federal Rule of Civil Procedure 45.................... 1, 13, 14

Movant Key Investment Group, LLC ("KIG") respectfully submits this Memorandum of Law in support of its Motion to Compel Respondents Senators Ben Ray Luján and Marsha Blackburn (collectively, the "Senators") to comply with those portions of the subpoenas issued to them pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

This case arises against the backdrop of a fundamental shift in how the Better Online Tickets Sales ("BOTS") Act, 15 U.S.C. § 45c, is being interpreted and enforced. For nearly a decade following its enactment, enforcement of the BOTS Act focused on what Congress and regulators repeatedly identified as the statute's intended target: the use of bots and other automated technologies to circumvent ticket purchasing limit controls. Yet in the underlying action, *Federal Trade Commission v. Key Investment Group LLC, et al.*, Case No. 1:25-cv-02716, pending in the District of Maryland (the "Underlying Litigation"), the FTC advances a novel theory that is not predicated on bot usage at all, but instead seeks to impose liability based on allegedly exceeding posted ticket-purchasing rules even where no bots were used. That expansionist interpretation marks a significant departure from prior enforcement of the statute and lies at the core of KIG's defenses.

No one is better positioned to shed light on that shift than Senators Blackburn and Luján—the BOTS Act's sponsor and supporter, respectively. The Senators are not detached observers. They publicly criticized Ticketmaster after the FTC announced its new enforcement actions, then voluntarily inserted themselves into both this case and the parallel Ticketmaster litigation as *amici* based on their claimed "unique" perspectives as the BOTS Act's drafter and supporter. The

[1] The supporting exhibits referenced herein are annexed to the Declaration of Bezalel A. Stern, sworn to on August 11, 2026 (the "Stern Decl."). Because the Senators have only provided general objections to the Modified Requests, as opposed to specific objections to each request, KIG is unable to comply with the requirements under Local Civil Rule 26.2(d).

Senators have urged courts to adopt the very expansive interpretation of the statute now being advanced by the FTC, which the court in the Underlying Litigation expressly relied upon in denying KIG's Motion to Dismiss. Having publicly advocated for a broadened construction of the BOTS Act in the Underlying Litigation, the Senators plainly possess information concerning the evolution of that interpretation and their newfound efforts to promote it.

KIG's subpoenas as modified seek narrowly tailored, non-privileged discovery directly related to those issues. Namely, (1) documents reflecting the Senators' understanding of the BOTS Act, (2) any changes in that understanding since enactment, and (3) communications with third parties concerning the Act's interpretation and enforcement. Rather than produce a single document, however, the Senators have responded with a blanket refusal and an extraordinarily broad assertion of protection under the Speech or Debate Clause. The Clause affords no such blanket immunity. It protects legitimate legislative activity, not public advocacy, *amicus* participation, communications with members of executive agencies or other non-governmental third parties, or efforts to influence ongoing litigation from the sidelines—especially where, as the FTC acknowledges, those efforts were "substantial" in "contribut[ing]" to the "fantastic KIG result" and denial of KIG's Motion. (*See* Stern Decl. Ex. 17.) Because the Senators have injected themselves into this case and now seek to use an overbroad privilege assertion to prevent scrutiny of their own representations, it is respectfully submitted that this Court should compel compliance with KIG's narrowly tailored discovery requests.

## FACTUAL BACKGROUND

### A. <u>The BOTS Act and the FTC's Prior Enforcement Under the Act.</u>

In 2016, Senator Blackburn, then a member of the United States House of Representatives, drafted and sponsored an earlier version of the BOTS Act through the House of Representatives and into the Senate. *See* H.R. 5104, 114th Cong. (2016). Although that version was not ultimately

adopted, Senator Blackburn was a vociferous voice in favor of the ultimate legislation. *See* Better Online Ticket Sales Act of 2016, S. 3183 114th Cong. (2016) ("S. 3183"). Senator Luján—also then a Representative—voted in support of the Law.

The BOTS Act was drafted in direct response to and intended to curb the use of computer scripts or computer code (*i.e.*, bots) designed to circumvent security measures, access control systems, and other technological controls in order to bypass the "virtual waiting room" lines of primary ticket sellers such as Ticketmaster, skip straight to the purchasing page, and purchase hundreds or thousands of tickets before the regular public had a fighting chance to purchase them. *See*, *e.g.*, S. Rep. No. 114-391, 2016 WL 7115899 (Dec. 5, 2016). When deployed, bots can overwhelm websites to unfairly jump to the heads of queues, lock tickets in carts *en masse*, and complete purchases in a matter of seconds. *Id.* The BOTS Act is intended to prevent this.

The legislative history of the BOTS Act clarifies that the Act was about stopping bad actors from using ***bots*** to subvert the ticketing process. In a Senate Hearing on the BOTS Act in September 2016, Senator Moran explained:

> When you're trying to pick up tickets for the next big event, you're no longer only competing against other eager fans when tickets are released, ***you're now focused—forced to compete against an army of sophisticated ticket bots that overwhelm the ticketing website with brute force, scoop up as many tickets as possible and then resell them on a secondary market at a significant mark-up.***

S. Hrg. 114-614, 2016 WL 4773371 (Sept. 13, 2016) (emphasis added). On November 30, 2016, a unanimous Senate passed the BOTS Act. Shortly thereafter, a Senate Report explained the BOTS Act's purpose before sending it back to the House. 2016 WL 7115899, at *4 (Dec. 5, 2016). The Report emphasized, "***this legislation [the BOTS Act] aims to prohibit the use of bots***[.]" *Id.* (emphasis added). Far from stifling the secondary ticket market, the Senate Report explained the BOTS Act "would have a positive impact on the secondary ticket sellers . . . ." *Id.*

President Obama signed the BOTS Act into law on December 14, 2016. *See* Pub. L. No. 114-274, 130 Stat. 1401 (2016). Portions of the law are codified at 15 U.S.C. § 45c. As enacted, the BOTS Act prohibits

> ***circumvent[ing]*** **a** ***security measure, access control system, or other technological control or measure*** on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

15 U.S.C. § 45c(a)(1) (emphasis added). The BOTS Act does not define any of the italicized terms, all of which are key to understanding the statute's reach.

The FTC was charged with enforcing the BOTS Act. *See* 15 U.S.C. § 45c(b). Consistent with its legislative history, following adoption the FTC made clear that the BOTS Act was intended to address the use of bots. In an April 2017 blog post, the FTC explained:

> It used to be a rite of passage: spending the night in a line outside the box office to score tickets to the Stones, Springsteen, or [insert your favorite group here]. The convenience of internet ticket sales ended the sleeping-on-the-sidewalk ritual. But online ticket sales raised another concern: ***Were prospective buyers losing out to computer programs that scooped up the best seats only to resell them at inflated prices***? Congress responded to that issue by passing the Better Online Ticket Sales Act of 2016.
>
> It's no coincidence that it's called the BOTS Act because ***the law outlaws the use of computer software like bots that game the ticket system***.

(Stern Decl., Ex. 1 (emphasis added).) Prior to the Underlying Litigation, the FTC had only entered into three settlements under the BOTS Act, all three of which involved recidivist bot users. (Stern Decl., ¶ 5, Stern Decl., Exs. 2-4.) In a concurring statement issued by the FTC, then-Chairwoman Rebecca K. Slaughter lauded her staff for these settlements and reveled in the new authority conferred upon the Commission by virtue of the BOTS Act "to bring to heel the ***high-tech scoundrels*** who bedevil fans seeking tickets to live events." (Stern Decl., Ex. 5 (emphasis added).) Doubling down on the BOTS Act's intended targets (*i.e.*, bot users), Chairwoman Slaughter added: "[t]he Act's bipartisan sponsors sought to crack down on the abuses that unscrupulous actors inflict

on consumers whose typing fingers were no match for ***algorithms in attempting to secure tickets online***." (*Id.* (emphasis added).)

**B. The Underlying Litigation and Related Ticketmaster Lawsuit.**

On August 18, 2025, the FTC filed a Complaint against KIG. (Stern Decl., Ex. 6 (the "Complaint").) The Underlying Litigation marks a stark deviation from the FTC's enforcement of the statute and positions regarding the same over the past decade since the statute's enactment—all of which focus on unlawful bot usage. (*See id.*) Indeed, ***nowhere*** in the Complaint does the FTC actually allege KIG uses bots—that's because it doesn't. Instead, the FTC advances a novel theory of liability that is not predicated on the use of bots at all, but on allegations that KIG used various means to purportedly "circumvent" security measures implemented by the Ticket issuer (Ticketmaster) to exceed posted ticket limits. (*See id.* ¶¶ 24, 34-50.) Put differently, based on the FTC's new reading of the BOTS Act, KIG can be liable for violating the statute if it "circumvented" security measures put into place by Ticketmaster to enforce its ticket limit purchasing rules.

As apparent support, the FTC includes an email exchange between Ticketmaster and KIG representatives, which demonstrates nothing but KIG's reliance upon Ticketmaster's interpretation and enforcement of its own purchasing rules. (*See id.*, Ex. A.) In the initial email dated February 2, 2024, a KIG representative informed Ticketmaster that he was a ticket broker that purchased 61 tickets to an event, which he understood "exceeded the ticket limit stated on the event page which allows a maximum of 6 tickets to be purchased" and, therefore, requested the orders be cancelled. (*Id.*) In response, the Ticketmaster representative advised KIG that the purchases did not exceed Ticketmaster's posted ticket purchase limits, which is determined on a "per account" basis. (*Id.*) The Ticketmaster representative further advised KIG that "[a]s long as the purchases were made using different accounts and cards, ***it's within the guidelines***." (*Id.* (emphasis added).)

The Underlying Litigation directly conflicts with allegations made in its separate lawsuit filed against Ticketmaster the following month in the Central District of California. (*See* Stern Decl., Ex. 7 (the "Ticketmaster Complaint").) In *that* case, the FTC accuses Ticketmaster of failing to enforce purported ticket purchase limits. (*See id.*, ¶¶ 74-76; 103-07.) Specifically, the FTC alleges that Ticketmaster "aided" ticket brokers (like KIG) to circumvent Ticketmaster's own security measures, so that (according to the FTC) Ticketmaster could maximize ticket sales. (*Id.*) In doing so, the FTC claims that Ticketmaster has separately violated the BOTS Act because it knowingly sells and otherwise permits tickets to be sold to brokers who have allegedly circumvented Ticketmaster's security measures. (*Id.*, ¶¶ 103-10; 119-25.)

**C. <u>The Senators Publicly Criticize Ticketmaster.</u>**

Coming off the heels of the FTC's lawsuits against KIG and Ticketmaster, on September 30, 2025, the Senators publicly issued a letter to Ticketmaster demanding answers relating to the purported scheme described in the FTC's complaint. (Stern Decl., Ex. 8.) Specifically, the Senators accused Ticketmaster of "turn[ing] a blind eye to bad actors violating the [BOTS] Act" and demanded Ticketmaster address a series of questions concerning Ticketmaster's commitment to prevent violations of the BOTS Act. (*Id.* at 1-3.)

On October 17, 2025, Ticketmaster issued a response—criticizing the Senators' and FTC's allegations of "colluding with scalpers" as "categorically false" and that "neither Live Nation nor Ticketmaster *ever* 'purposefully relax enforcement of ticket limits for certain buyers or brokers for financial gain.'" (Stern Decl., Ex. 9.) Critically, Ticketmaster addressed the "misimpression" of collusion created by the FTC, which, according to Ticketmaster, failed to recognize longstanding ticket purchasing practices:

> The reality is that brokers have had multiple accounts for a very long time—long before Ticketmaster entered the secondary ticketing business in 2014, and well

> before StubHub created the first successful secondary ticket marketplace in the early 2000s. This practice harkens back to the days of physical tickets, when ticket brokers would often have a number of employees or others paid to stand in line and purchase concert tickets—a practice that was generally accepted in the industry. Similarly, it was generally accepted that a broker with multiple employees could have each person hold an account and separately purchase tickets. All this can be done legitimately under the rules of the primary ticketing companies without having to resort to any unlawful behavior.

(*Id.* at 2-3.) Put differently, the use of multiple accounts is "not inherently illegal." (*Id.*) Ticketmaster also rebuffed the Senators' suggestion that it has ever turned a "blind eye," particularly when it invests more in bot detection and prevention than any other ticket issuer. (*Id.* at 4.) And, finally, like KIG here, Ticketmaster criticized the FTC for its "novel and expansionist view of the BOTS Act," which "makes it illegal to circumvent *ticket limits*—full stop—not just technological controls protecting ticket limits." (*Id.* at 7.)

### D. <u>KIG and Ticketmaster Move to Dismiss and the Senators file *Amicus* Briefs in Support of the FTC</u>

On November 24, 2025, KIG moved to dismiss the FTC complaint. (Stern Decl., Ex. 10.) Relevant for purposes of this Motion, KIG argued that (i) it did not circumvent because, among other things, Ticketmaster was aware of and permitted KIG's ticket purchase practices, (*id.* at 13-18); (ii) it did not have actual knowledge or knowledge fairly implied that its actions violated the BOTS Act, (*id.* at 21-25); and (iii) the BOTS Act is unconstitutional. *Id.* at 26.

On December 31, 2025, the Senators moved for leave in the Underlying Litigation to file a brief as *amici curiae* in support of the FTC's opposition to KIG's Motion to Dismiss—which addressed point-for-point arguments advanced by KIG. (Stern Decl., Ex. 11.) In support of their Motion, Senator Blackburn highlighted her role as "lead Republican sponsor and a primary architect of the [BOTS Act]"[2] and Senator Luján noted his support of the BOTS Act, while serving

---

[2] This statement is not technically true, as H.R. 5104, the bill Senator Blackburn sponsored, died in the Senate. Nonetheless, the Senator did support S. 3183 as it made its way from the Senate to the House of Representatives.

in the House of Representatives and his "strong interest in the proper interpretation and application of the law." (*Id.* at 1.) According to the Senators, their ***unique background and perspectives*** would provide the court with "useful legislative context" needed to address a novel question presented before it:

> An amicus brief from Senator Blackburn and Senator Luján is desirable because it provides the Court with ***useful legislative context to aid in rendering the correct interpretation of the BOTS Act and its broad scope***. Because this litigation centers on a novel question regarding what constitutes "circumvent[ion]" under the Act, ***Senator Blackburn's perspective as a leading drafter, and Senator Luján's perspective as a supporter of the bill, offer unique insights*** that could assist the Court in resolving the Defendants' pending motion to dismiss.
>
> ***Amici can clarify the legislative intent animating the statute's use of the word "circumvent" and the intended conduct that the legislation targeted***. This context may assist the Court as it evaluates the breadth of Congress's mandate to the FTC for enforcement in this area. This context is particularly important given Defendants' erroneous speculation about what the drafters "believed" when crafting the BOTS Act. This proposed amicus brief affords the law's leading drafter and sponsor, Senator Blackburn, with the opportunity to disabuse the Court of Defendants' misrepresentations. Furthermore, Amici provide perspectives on how bulk-buying and scalping operations siphon wealth from creators and consumers and impede access to live events, thereby harming the economies and constituents of their respective states.

(*Id.* at 2 (emphasis added).)

In their *amicus brief*, the Senators argued that the BOTS Act is not limited to the use of bots. (Stern Decl., Ex. 12 at 2 ("contrary to Defendants' representations Amici—as drafter (Senator Blackburn) and supporter (Senator Luján) of the law—did *not* believe the BOTS Act was confined solely to use of bot technology"); at 4 ("If Amici and their fellow legislators had intended to limit the BOTS Act's application to bot users, they could—and would—have said so").) They further argued that whether ticket issuers actually enforce their posted rules (or otherwise permit or acquiesce to noncompliance with same) is irrelevant for purposes of determining liability under the Act because the statute does not recognize "permission" as a defense:

> Yet again, the ordinary meaning of the statutory term "circumvent" forecloses Defendants' argument. Circumvention does not turn on a "system operator's authorization or permission." If, for example, Ticketmaster failed to enforce its rules against bot usage, that would not change whether a scalper is using bots to "circumvent" Ticketmaster's controls. By using bots (or other means), a user "manages to get around" ticket-issuer controls, permission or acquiescence notwithstanding. That is still unlawful circumvention, plain and simple.
>
> An analogy to trespass is instructive. If a property owner turns a blind eye to trespass, that does not mean the trespasser has not climbed over the fence. He *has* climbed over the fence—but with tacit permission. In trespass, of course, permission is a defense. But the BOTS Act includes no such exception. That is because violating the BOTS Act harms *event-going consumers*—not ticket issuers like Ticketmaster. Any lack of enforcement or blind-eye treatment by Ticketmaster cannot absolve scalpers of BOTS Act liability. Holding otherwise would create an atextual exemption for collusive conduct between scalpers and ticket issuers that would harm the very people that the BOTS Act was plainly intended to protect—ordinary Americans who want to see their favorite performers or sports teams at reasonable prices.

(*Id.* at 6-7 (citations omitted).) And, finally, the Senators argued that the BOTS Act was intended to have broad reach and punish those who violate a ticket issuer's posted rules—regardless of whether bots were used or not:

> When Amicus Senator Blackburn introduced the BOTS Act and Congress unanimously passed it into law, legislators drew attention to the problem of online ticket scalpers. The problem troubling Amici and their fellow lawmakers was not just scalpers using bots to gain an unfair advantage—though, to be sure, that was a significant concern. The root problem was that ticket scalpers did not play by the rules; they cheated and enriched themselves at the expense of the ordinary American consumer. By evading ticket-issuer rules like ticket-purchase limits—whatever their means of doing so—to snatch up and accumulate hoards [*sic*] of tickets, online scalpers forced many Americans into secondary markets where scalpers then resold their tickets at exorbitant markups.

(*Id.* at 10.)

In the parallel Ticketmaster proceeding, on January 6, 2026, Ticketmaster moved to dismiss the FTC complaint, arguing, among other things, that the FTC complaint fails to identify any technological controls that were actually circumvented and, instead, simply identifies instances where tickets were purchased in violation of ticket limits (which is not a technological control).

(Stern Decl., Ex. 13, at 21-24.) Three weeks later, on January 30, 2026, Senators Blackburn and Luján moved for leave to file an *amicus* brief in support of the FTC's opposition to Ticketmaster's Motion to Dismiss. (Stern Decl., Ex. 14.) As in the Underlying Litigation, the Senators highlighted their "unique legislative perspective on the interpretation and enforcement of the BOTS Act" that "uniquely position[]" the Senators to expound upon. (*Id.* at 4.) In response to Ticketmaster's arguments, the Senators, again, argued that the BOTS Act is intended to have broad application and enforcement and used the same exact trespassing analogy to illustrate that a ticket issuer's permission or consent does not absolve a party of liability under the statute. (Stern Decl., Ex. 15, at 2-3, 7 n.2, 10-11.)

### E. <u>The District Court Relied Upon Arguments Advanced by the Senators in Denying KIG's Motion to Dismiss in the Underlying Litigation.</u>

On April 28, 2026, the Court issued its Decision and Order granting the Senators' Motion for Leave to file an *Amicus* Brief (which the court considered "in its analysis of the Motion to Dismiss") and denying KIG's Motion to Dismiss. (Stern Decl., Ex. 16.) On the issue of whether the BOTS Act "exclusively applies to 'bots,'" the Court extensively cited and relied upon the Senators' brief as support for its determination that "[t]he legislative history of the BOTS Act does not support a narrow reading as Defendants suggest." (*Id.* at 10.) For example, the Court stated:

> As Amici Senators explain, "the operative text of the BOTS Act does not limit its application to scalpers who use bots. In fact, the law's key provision does not reference bots at all." Further, and most critically, "contrary to Defendants' representations, Amici—as drafter (Senator Blackburn) and supporter (Senator Luján) of the law—did not believe the BOTS Act was confined solely to use of bot technology." Rather, "the problem troubling Amici and their fellow lawmakers was not just scalpers using bots to gain an unfair advantage—though, to be sure, that was a significant concern."

(*Id.* (citations omitted).) Similarly, in rejecting KIG's argument challenging the BOTS Act under the major questions doctrine, the court again relied upon the Senators' *Amicus* Brief as support for

its reasoning that the Act "does not seek to regulate large swaths of the economy nor is it particularly politically significant or controversial." (*Id.* at 14.)

That very same day, the FTC's chief litigation counsel wrote to the Senators' counsel to share with them the court's denial of KIG's Motion and to express his "gratitude" for the Senators' support. (*See* Stern Decl., Ex. 17.) In the underlying email, the FTC expressly recognizes the impact that the Senators' *amicus* brief had on the court's ruling:

> I just wanted to express my gratitude for ***the substantial contribution that you and your clients made to the fantastic KIG result***. We really appreciate it. And we hope for good news in Ticketmaster soon.

(*Id.* (emphasis added).)

### F. KIG's Efforts to Obtain the Requested Discovery from Senators Luján and Blackburn.

On June 30, 2026, KIG issued subpoenas to the Senators, which were accepted by the Deputy General Counsel for the U.S. House of Representatives on July 1, 2026. (Stern Decl., Exs. 19, 20.) The subpoenas sought information likely to be directly relevant to the Underlying Litigation. Among other things, the subpoenas sought documents and communications concerning: (i) KIG and the named defendants in the underlying action; (ii) the Senators' amicus briefs filed in the Underlying and Ticketmaster Litigations; (iii) their understanding of the BOTS and MAIN Event Ticketing Acts; and (iv) Ticketmaster. (*Id.*)

On July 15, 2026, the Senators responded to their subpoenas, declining to produce any records or information whatsoever. (Stern Decl., Ex. 21.) Critically, the Senators neither confirmed nor denied the existence of responsive information but, instead, claimed that the information sought (i) is "absolutely protected" under the Speech or Debate Clause, (ii) presents an undue burden "because they request materials that are not relevant to the claims in this action, seek an overly broad scope of documents, and seek documents from a nonparty that should be sought from

a party to the action"; (iii) is protected by the attorney-client and work product privileges; (iv) requires prior Senate approval; and (v) is "insulate[d]" by "the doctrine of sovereign immunity." (*Id.*)

On July 22, 2026, counsel for KIG met and conferred with counsel for the Senators. During the conferral, counsel for KIG made clear at the outset that they were not interested in any privileged documents and, instead, sought documents reflecting the Senators' understanding of the BOTS Act, post-enactment, and efforts to inform the public and agencies regarding the same. (Stern Decl., ¶ 25.) These documents, counsel for KIG explained, were highly relevant in light of the fact that the Senators emphasized their "unique perspectives" as sponsors and supporters of the BOTS Act in the Underlying Litigation, which the Court accepted and relied upon in denying KIG's Motion to Dismiss. (*Id.*, Stern Decl., Ex. 11.)

Any change in view by the Senators as to how broadly the statute was to be enforced, then, would go directly to KIG's defenses. (*Id.*) This much, the Senators' counsel did not dispute. (Stern Decl., ¶ 25.) As far as their assertion of burden, the Senators' counsel admitted that while they were familiar with the "types of communications" involving the Senators that could be responsive to KIG's requests, they had not actually began of substantive review or even collection of same. (Stern Decl., ¶ 26.) That said, for purposes of attempting to reach an agreement, KIG offered to significantly narrow the scope of what the subpoenas sought.

The following day, in an effort to address points previously raised by the Senators, KIG narrowed its prior sixteen requests to just six (the "Modified Requests"), proposed as follows:

> **Modified Request No. 1**: All non-privileged Documents and Communications demonstrating Your understanding as to what constitutes "circumvent[ion]" under the BOTS Act.

> **Modified Request No. 2**: All non-privileged Documents and Communications concerning Your contention that "the BOTS Act was [not]

> confined solely to use of bot technology," as set forth on pages 2 through 6 of the Amicus Brief You filed in the Action.
>
> **Modified Request No. 3**: All non-privileged Documents and Communications showing any change in Your understanding or interpretation of the BOTS Act since its enactment.
>
> **Modified Request No. 4**: All non-privileged Documents and Communications between You and any third-party concerning the interpretation and enforcement of the BOTS Act.
>
> **Modified Request No. 5**: All non-privileged Documents and Communications between You and any third-party, including but not limited to the FTC, concerning Defendants.
>
> **Modified Request No. 6**: All non-privileged Documents and Communications between You and any third-party, including but not limited to the FTC, concerning the Amicus Brief You filed in the Action.

(Stern Decl., Ex. 22.) Almost a week later, on July 29, the Senators' counsel responded by rejecting KIG's Proposed Requests outright. Citing no factual or legal support, the Senator's counsel baldly claimed that "the overwhelming majority of documents sought by the subpoenas are absolutely protected from compelled disclosure under the Speech or Debate Clause, as they constitute communications integral to the Senators' legislative activities regarding the BOTS Act and the pending MAIN Event Ticketing Act." (*Id.*) Given the Senators' refusal to meaningfully engage further with KIG, the parties have reached an impasse.

Accordingly, KIG now brings the present Motion, moving to compel the Senators to produce documents and communications responsive to the Modified Requests.

## LEGAL STANDARD

"Disputes over third-party subpoenas to agencies in civil litigation . . . must commence in the district court under Rule 45," which "authorizes court-issued subpoenas to obtain discovery from third parties." *Watts v. S.E.C.*, 482 F.3d 501, 503, 507 (D.C. Cir. 2007). Rule 45 requires that district courts enforce subpoenas over agencies' objections so long as the subpoenas do not call

for privileged matter or cause undue burden. *Id.* at 508; *see also Alexander v. F.B.I.*, 186 F.R.D. 21, 43 (D.D.C. 1998). When deciding a motion to compel under Rule 45, courts must first consider whether the discovery sought is relevant to a party's claim or defense in the Underlying Litigation, as defined in Rule 26(b)(1). *See id.*; *see also In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 123 (D.D.C. 2013). Next, the court must assess any objections to the subpoena under the standards supplied by Rule 45, which "requires that district courts quash subpoenas that call for privileged matter or would cause an undue burden." *Watts*, 482 F.3d at 508. "The burden lies on the party resisting discovery to show that the documents requested are either unduly burdensome or privileged." *In re Micron Tech., Inc. v. Sec. Litig.*, 264 F.R.D. 7, 9 (D.D.C. 2010).

## ARGUMENT

### I. <u>The Modified Requests Seek Information Highly Relevant to Claims and Defenses in the Underlying Litigation</u>

The Modified Requests principally seek documents and communication reflecting the Senators' understanding of how the BOTS Act is to be interpreted and enforced (including any changes therein). They are clearly relevant to the Underlying Litigation and KIG's defenses therein.[3] It is well-settled that "[f]or purposes of discovery, relevance is liberally construed" and, in the context of a Rule 45 subpoena, "request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *In re Denture Cream Prods. Liability Litigation*, 292 F.R.D. at 123. As discussed below, the information sought by KIG is plainly relevant.

---

[3] In response to the initially-served subpoenas, the Senators asserted a blanket relevance objection. (Stern Decl., Ex. 21.) However, upon receiving the Modified Requests, their primary objection is moored to the Speech or Debate Clause. (Stern Decl. Ex. 22.) That said, for completion's sake, KIG begins by first addressing the plain relevance of its requests before addressing the Senators' primary privilege objection.

***First***, the Senators—as vociferous supporters of the BOTS Act—possess "unique" perspective and insights relating to the enactment of the bill. Indeed, in their own court submissions in the Underlying Litigation, they emphasized this very point as a primary reason for the court to consider granting their Motion to file an *Amicus* Brief—that their unique experiences could provide the court with "useful legislative context" necessary for evaluating arguments advanced by KIG as part of its Motion to Dismiss—including that the BOTS Act was intended to be applied broadly. (Stern Decl., Ex. 11.) The court, in turn, relied upon arguments advanced by the Senators in their *Amicus* Brief in denying KIG's Motion. (Stern Decl., Ex. 16.) The court's reliance upon material representations made by the Senators in their *Amicus* Brief confirms the relevance of the information sought by KIG.

***Second***, since the BOTS Act's enactment, the Senators' view (or change in view) on how the Act should be interpreted and enforced (including discussions with other agencies or non-governmental third-parties) is unquestionably relevant to claims and defenses in the Underlying Litigation. That is especially true here given that, prior to the Underlying Litigation, the ***only*** circumstances in which the FTC enforced the BOTS Act have been against recidivist bot users. (Stern Decl., Exs. 2-4.) Indeed, it is readily apparent that there has been a paradigm shift in how the FTC has chosen to interpret and enforce the BOTS Act, given the novel theories advanced against both KIG and Ticketmaster. (*See, e.g.* Stern Decl., Ex. 9 ("The FTC case is based on a fundamentally novel and expansionist view of the BOTS Act that makes it illegal to circumvent ticket limits—full stop—not just technological controls protecting ticket limits.").) Given the Senators' deep involvement in not only the statute's passage, but in defending its novel enforcement against KIG and Ticketmaster (as evidenced by their *amicus* briefs in both lawsuits), they clearly possess knowledge and information concerning the Act.

***Finally***, the information requested by KIG is plainly relevant to its ability to establish that the BOTS Act was never intended to be enforced in the manner in which the FTC now does against KIG. *BuzzFeed, Inc. v. U.S. Dep't of Just.*, 318 F. Supp. 3d 347, 356-58 (D.D.C. 2018) (granting motion to compel compliance with third-party subpoenas to DOJ, FBI, and other government entities where requested information was "directly relevant" to defendant's asserted fair-report-privilege affirmative defense); *Educ. Fin. Council v. Oberg*, 2010 WL 3719921, at *3-5 (D.D.C. Mar. 8, 2010) (compelling production from a non-party trade association where communications with the Department of Education were relevant to defendants' affirmative defense that the government knew of and approved their practices). This, in turn, goes directly to key defenses that KIG has asserted in Underlying Litigation, chief among them being KIG's lack of knowledge (Fourth Affirmative Defense) and KIG's constitutional defenses, including that the BOTS Act is unconstitutionally vague (Twelfth Affirmative Defense), the FTC failed to provide fair notice (Thirteenth Affirmative Defense), and the FTC's selective enforcement of the BOTS Act violates the Equal Protection Clause (Fifteenth Affirmative Defense). (Stern Decl., Ex. 18.) The same information could also defeat the FTC's efforts to seek civil penalties against KIG, since it would further demonstrate KIG's lack of actual knowledge or knowledge fairly implied that its actions violated the BOTS Act. 15 U.S.C. § 45(m)(1)(A) (allowing for civil penalties if an entity violated the BOTS Act "with actual knowledge or knowledge fairly implied on the basis of objective circumstances").

At bottom, it cannot be disputed that the requests proposed by KIG seek highly relevant information to potentially establish key affirmative defenses and to rebut the element of knowledge for purposes of issuing civil penalties.

## II. **The Modified Requests Do Not Implicate Any Form of Privilege**

The Modified Requests do not seek any information that could implicate any of the privilege asserted by the Senators. In their initial response, the Senators raised several doctrinal defenses that purportedly excuse their compliance with the Modified Requests. None have merit.[4]

It is well-settled that excusing the compliance of a subpoena "is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances." *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005). Members of Congress are not immune from the issuance of subpoenas and cannot make blanket refusals to produce non-privileged discoverable information—which is precisely what the Senators attempt to do here, by asserting privilege under the Speech or Debate Clause. *See Franklin v. Mass.*, 505 U.S. 788, 826 (1992); *Gravel v. United States*, 408 U.S. 606, 614-15 (1972).

The Speech or Debate Clause states that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The "central object of the . . . Clause is to protect the 'independence and integrity of the legislature.' " *McCarthy v. Pelosi*, 5 F.4th 34, 38 (D.C. Cir. 2021) (citation omitted). The Supreme Court has cautioned, however, that the Speech or Debate Clause's protection only extends to "legislative acts" that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings." *Gravel v. United States*, 408

[4] The Senators originally argued (i) the documents sought by KIG are privileged under the Speech or Debate Clause; (ii) they are entitled to sovereign immunity; and (iii) the Standing Rules of the Senate excuse their compliance. For over sixty years, however, the D.C. Circuit "has assumed the nonapplicability of sovereign immunity to such a subpoena" and, instead, has evaluated the challenges to discovery based on special privileges. *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 398 n.2 (D.C. Cir. 1984); *see McCarthy v. Pelosi*, 5 F.4th 34, 38-41 (D.C. Cir. 2021) (evaluating challenged legislative acts exclusively under the Speech or Debate Clause); *see also Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 52-63 (D.D.C. 2007) (granting, in part, motion to compel compliance with subpoenas served upon members of congress). Given the overlapping principles and frameworks at play, *see Jewish War Veterans*, 506 F.Supp.2d at 50-52 (discussing safeguards afforded under House Rules, the Federal Rules of Civil Procedure, and the Speech and Debate Clause), KIG addresses these issues in the context and framework of the Speech and Debate Clause, which is the primary objection relied upon by the Senators.

U.S. 606, 625 (1972). The D.C. Circuit has clarified that "legislative acts" include "(i) matters pertaining 'to the consideration and passage or rejection of proposed legislation,' and (ii) 'other matters which the Constitution places within the jurisdiction of either House." *McCarthy*, 5 F.4th at 40 (quoting *Gravel*, 408 U.S. at 625).

Here, to justify the complete refusal to comply with either subpoena, the Senators assert that "the overwhelming majority of documents sought by the subpoenas are absolutely protected from compelled disclosure under the Speech or Debate Clause." (Stern Decl., Ex. 22.) But this is facially untrue.

The Senators' invocation of the Clause is fundamentally misplaced given that the Modified Requests do not seek documents or information reflecting their performance of legislative acts. On the contrary, the Modified Requests seek documents and communications that reflect the Senators' efforts to inform the judiciary, the public, and other agencies regarding their post-enactment understanding of the BOTS Act, including the scope of the statute's reach for enforcement purposes, which are outside the legislative forum and not protected by the Speech or Debate Clause.

For example, Modified Request Nos. 1 and 2 request documents and communications concerning the Senators' respective understandings as to what constitutes "circumvent[ion]" under the BOTS Act and the basis for their contention that "the BOTS Act was [not] confined solely to use of bot technology," which were key arguments advanced in their own *amicus* brief. (*Id*., Stern Decl., ¶ 28.) Similarly, Modified Request No. 3 seeks documents and communications concerning any change in the "understanding or interpretation of the BOTS Act since its enactment." These requests drive at the heart of understanding the ***legislative purpose*** behind the BOTS Act, which

the Senators put squarely at issue by virtue of their *amicus* brief, and ***not*** the Senators' motives for sponsoring or supporting the bill itself.

The distinction between legislative "purpose" and legislative "motives" carries legal significance—the former ("purpose") does not invade the province of "legislative acts." *N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 135 F.R.D. 78, 80 (S.D.N.Y. 1991); *Glassroth v. Moore*, 229 F. Supp. 2d 1290, 1315-16 (M.D. Ala. 2002) ("there is a difference between [legislative] motive and purpose"), *aff'd*, 335 F.3d 1282 (11th Cir. 2003); *see also Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 60 (D.D.C. 2007) (accord and collecting cases). Recognizing this distinction, the Southern District of New York held that while the latter reflects "a political decision to support or oppose proposed legislation," which should be immune from discovery, the former does not and "need not be protected." *Id.* That is especially true here given (as in *Shaffer*) KIG seeks similar "[d]ocuments relating to the underlying rationale or purpose for the legislation and rulemaking . . . which are created or approved by those already publicly supporting it" and therefore "need not be protected and would better serve the public interest by disclosure." *Id.*

The remaining three Modified Requests seek documents and communications between the Senators, on the one hand, and ***third parties*** (whether the press, the executive branch, or other agencies) on the other—are similarly not exempt from discovery. The Supreme Court has consistently held that communications and engagements with the press do not qualify as "legislative acts" protected by the Speech or Debate Clause because they are inherently *political* (not legislative) in nature. *See Brewster*, 408 U.S. at 512 (recognizing that "Members of Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause," including "preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress."); *Hutchinson v. Proxmire*, 443 U.S. 111, 132-33 (1979)

("the duty of Members to tell the public about their activities . . . is not a part of the legislative function or the deliberations that make up the legislative process."). The same reasoning applies to communications with agencies outside of Congress, which are similarly "not immune from inquiry" based on the dissemination of information "to individuals or agencies outside of Congress." *McSurely v. McClellan*, 553 F.2d 1277, 1297 (D.C. Cir. 1976).

In short, none of the categories of documents requested in the Modified Requests reflect "legislative acts" protected by the Speech or Debate Clause. To accept the Senators' contrary, overbroad, interpretation and application here would run squarely afoul of the precedent above and the Supreme Court's express warning that "legislative acts" covered by the Clause "are not all-encompassing." *See Gravel*, 408 U.S. at 625.

## III. <u>The Senators' Remaining Boilerplate Objections are Without Merit</u>

In addition to their blanket Speech or Debate Arguments, the Senators offer a laundry list of other objections, each more dubious than the next.

### A. <u>The Modified Requests Do Not Subject the Senators to Undue Burden</u>

The Senators would be hard-pressed to claim undue burden if ordered to comply with the subpoena and produce documents responsive to the Modified Requests. To balance "the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations," courts weigh several factors in evaluating a claim of burden, including: "whether the discovery is unreasonably cumulative or duplicative, whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive; and whether the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation and the importance of the proposed discovery in resolving the issues."

*Watts*, 482 F.3d at 509 (internal citations omitted). Given that the Senators are the party resisting discovery, they "carr[y] [the] 'heavy' burden of persuasion," which they fall far short of satisfying. *United States v. AT&T, Inc.*, 2011 WL 5347178, at *5 (D.D.C. Nov. 6, 2011).

***First***, the Senators cannot credibly argue that the Modified Requests seek duplicative or cumulative materials; on the contrary, KIG seeks information that by its very nature is uniquely within the Senators' possession—i.e., information reflecting their interpretation and enforcement of the BOTS Act (including any material changes therein).

***Second***, with the exception of communications with the FTC—which KIG has separately propounded discovery upon, and which the FTC has in large part refused to provide—the requested documents and information cannot be obtained from alternative sources. Indeed, with the exception of the FTC, KIG is not aware of any other parties or sources that are in possession of similar information. But the Senators are. That should not come as a surprise to the Senators given that they readily admit to possessing "unique" perspectives and experiences as sponsors and supporters of the law that enable them to "offer unique insights" as to how the statute is to be interpreted and enforced. (Stern Decl., Ex. 11; *see also Buzzfeed*, 318 F. Supp. 3d at 360 (rejecting undue burden argument where documents sought could not be obtained from some other source).

***Third***, the Senators cannot be credibly heard to complain of burden ***when they have not even made a meaningful effort to demonstrate the nature and scope of their purported burden***. *Tequilla Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 10 (D.D.C. 2007) (overruling burden objections where party resisting discovery failed to make any showing demonstrating overbreadth); *Athridge v. Aetna Cas. And Sur. Co.*, 184 F.R.D. 181, 190-91 (D.D.C. 1998) (holding that party resisting discovery waived objection based on burden based on failure to offer any evidence as to the nature of the burden). That aside, any claim of burden imposed by the subpoenas

(as initially served) has been obviated by the Modified Requests, which eliminates entire categories of documents and merely seek information that reflect the Senators' respective understanding of the BOTS Act and any potential change in view of the same. *See AT&T*, 2011 WL 5347178, at *7 (granting motion to compel where movant narrowed production requests to seek only those non-duplicative documents central to the case and to eliminate other requests from the scope of its subpoena).

***Fourth***, the importance of the issues at stake further counsel in favor of compelling compliance. The Underlying Litigation presents a novel theory and approach to enforcing the BOTS Act—one that does not actually implicate the use of bots or other technological tools to circumvent a ticket provider's security measures. This marks a complete deviation from the plain language of the statute and how it has been previously enforced. If, as KIG anticipates, there was a deliberate change in view as to how the statute should be interpreted and enforced—one that has never been disclosed publicly—it has serious implications on not just the Underlying Litigation, but also other related enforcement actions (including the related Ticketmaster litigation) that involve this novel interpretation.

***Finally***, and fundamentally, the Senators have no right to completely defy their discovery obligations. *See Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1025 (Fed. Cir. 1986) ("When a court is confronted with a motion to quash, its duty is not to deny discovery altogether, but to reduce the demand to a reasonable level, considering the parties' concerns.").

### B. The Documents Requested Do Not Implicate the Attorney-Client Privilege or Work-Product Doctrines

The Court should reject any attempt by the Senators to withhold documents on the basis of privilege or work product. None one of the Modified Requests seek information that could even remotely be argued as invading either privilege. On the contrary, the first three Modified Requests

are limited to seeking ***non-privileged*** documents and communications concerning the Senators' understandings as to what constitutes "circumvention" (Modified Request No. 1), the Senators' contention that the BOTS Act was intended to be construed and enforced broadly (Modified Request No. 2), and any change in the Senators' understanding or interpretation of the BOTS Act (Modified Request No. 3). Similarly, the remaining three Modified Requests seek documents and communications between the Senators (on the one hand) and ***any third-party*** (on the other). The Senators cannot maintain any legitimate privilege assertion over communications or documents shared with third parties. *Blumenthal v. Drudge*, 186 F.R.D. 236, 243 (D.D.C. 1999) (holding that communications shared with third parties were not protected by attorney-client privilege and had to be produced because disclosure destroyed confidentiality).

## CONCLUSION

For the foregoing reasons, KIG respectfully requests that this Court compel the Senators to comply with the subpoenas and provide substantive documents and communications in response to the Modified Requests.

Dated: August 11, 2026
Washington, D.C.

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

*/s/ Bezalel A. Stern*

Bezalel A. Stern (D.C. Bar No. 1025745)
Joshua N. Drian (D.C. Bar No. 7669248)
1700 M Street NW, 4th Floor
Washington, D.C. 20036
(202) 585-6500
bstern@manatt.com
jdrian@manatt.com

*Counsel for Movant*